UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA PRESSLEY,                                          )
                                                           )
                              Plaintiff,                   )        18 C 2103
                                                           )
              vs.                                          )        Judge Gary Feinerman
                                                           )
ANDREW M. SAUL, Commissioner of Social Security,           )
                                                           )
                              Defendant.                   )

## MEMORANDUM OPINION AND ORDER

In June 2009, Patricia Pressley filed a claim for supplemental security income ("SSI")

benefits with the Social Security Administration, alleging disability beginning May 1, 1992.

Doc. 14-6 at 2. The Commissioner denied the claim, Doc. 14-4 at 2, and then denied Pressley's

request for reconsideration, *id*. at 3. Pressley sought, Doc. 14-5 at 19, and received a hearing

before an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 416.1429, Doc. 14-3 at 69-

110. The ALJ denied the claim, Doc. 14-4 at 19, and Pressley sought review from the Social

Security Appeals Council, Doc. 14-5 at 100, which remanded for further adjudication, Doc. 14-4

at 26. The same ALJ held another hearing, Doc. 14-3 at 41-68, denied Pressley's claim again, *id*.

at 32, and the Appeals Council denied Pressley's request for review, *id.* at 2, making the ALJ's

decision the final decision of the Commissioner, *see Scrogham v. Colvin*, 765 F.3d 685, 695 (7th

Cir. 2014) ("Because the Administration's Appeals Council declined to review the ALJ's

decision, we review the ALJ's decision as the final decision of the Administration."). Pressley

timely sought judicial review pursuant to 42 U.S.C. § 405(g). *Pressley v. Colvin*, No. 15 C 6282

(filed July 17, 2015) ("*Pressley I*"). The district court remanded the case to the Commissioner

for further proceedings. *Pressley I*, Docs. 36-37 (Nov. 8, 2016) (Kim, M.J.).

On remand, the Appeals Council vacated the ALJ's decision and ordered a new hearing. Doc. 14-11 at 68. The hearing was held before a different ALJ. Doc. 14-10 at 37-82. The ALJ denied Pressley's claim, *id*. at 25, and Pressley again seeks review under § 405(g). Doc. 1; *see* Doc. 14-10 at 3 ("If [the claimant] do[es] not file written exceptions [to the ALJ's decision] and the Appeals Council does not review [the] decision on its own, [the] decision will become final on the 61st day following the date of [the] notice."). The parties cross-move for judgment. Docs. 25, 29. Pressley's motion is granted, the Commissioner's motion is denied, and the case is remanded to the Commissioner for further proceedings.

## Background

The following facts are taken from the administrative record.

### A.      Factual Background

From 1994 to 2007, Pressley held jobs at, among other places, fast food restaurants, a bowling alley, and a hardware store; she stopped working on December 15, 2007. Doc. 14-13 at 11-16; Doc. 14-8 at 454. The basis for Pressley's SSI claim is that she cannot work due to serious mental and physical ailments, including type II bipolar disorder, schizophrenia, anxiety, sciatica, and high blood pressure. Doc. 14-8 at 454.

On January 24, 2007, Harley Rubens, M.D., performed a psychiatric evaluation of Pressley for the Bureau of Disability Determination Services ("Bureau"). Doc. 14-8 at 81-85. Rubens diagnosed Pressley with adult attention deficit hyperactivity disorder ("ADHD"); post-traumatic stress disorder ("PTSD"); adjustment disorder of mood and conduct; a not otherwise specified personality disorder, highlighting impulsivity; and obesity. *Id*. at 84. Dr. Rubens's report noted that Pressley had undergone right wrist surgery, which severed part of a nerve, leaving her "unable to hold a gallon of milk." *Ibid*. The report also noted that Pressley received

a relatively low score of 35 on the Global Assessment of Functioning ("GAF") scale. *Ibid*.; *see* Global Assessment of Functioning, Wikipedia, en.wikipedia.org/wiki/Global_Assessment_of_Functioning ("The Global Assessment of Functioning (GAF) is a numeric scale used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of an individual, e.g., how well one is meeting various problems-in-living. Scores range from 100 (extremely high functioning) to 1 (severely impaired)."). Dr. Rubens wrote that Pressley "had a number of traumatic events in childhood and in adulthood related to her original family," with "a lot of violence from her father," who "used drugs[,] alcohol[,] and had bizarre sexual encounters" with an unidentified woman and Pressley's stepbrother. Doc. 14-8 at 84. Dr. Rubens further noted that Pressley "seems to have had trouble with concentration and settling down most of her life," and that "[c]onflicts with authority sometimes trigger [her] PTSD symptoms," but that she "functioned well in a managerial role" when she took proper medication. *Id*. at 84-85.

From June 18, 2009 to July 23, 2009, William Egan, M.D., assessed Pressley over the course of four appointments. *Id*. at 427-431. He diagnosed her with bipolar II disorder mixed, interpersonal disorder, asthma, hypertension, and obesity, and gave her a GAF score of 50. *Id*. at 431. Dr. Egan initially prescribed Seroquel, *id*. at 431, then replaced the Seroquel with Lorazepam and Abilify, *id*. at 429, and then added Trazodone after Pressley reported trouble sleeping and he determined that she was "fearful of authority." *Id*. at 427. Dr. Egan noted that the Lorazepam and Abilify appeared to make Pressley much calmer and in control, with her reporting on July 23, 2009 that she was "fine." *Ibid*.

Audrey Gerdt, M.S.W., assessed Pressley over the course of two appointments on June 1, 2009 and June 29, 2009. Doc. 14-8 at 432-439. Pressley told Gerdt of the physical and

emotional abuse she suffered as a child, including that her mother and father told her "that she was a mistake," that her father "would physically abuse [her] and her mother," that she was prescribed lithium at age ten, and that she was in a psychiatric hospital for "a long time" at age thirteen after she "held a knife to her father" in an attempt to stop him from "beating her mother." *Id*. at 432. Pressley reported that she, her fiancé, and two children were "homeless … living in their van," *ibid*., and that she had experienced homelessness "about 9 times over the past 11 years," *id*. at 435. In her report, Gerdt described Pressley's mood as labile and stated that she "seemed to alternate between depressive, hypomanic and angry." *Id*. at 435. Gerdt recommended "psychiatric services, individual treatment, group treatment, case management and crisis intervention services to assist [Pressley] to manage her mood disorder," and noted that Pressley appeared "motivated and willing to participate in treatment." *Id*. at 436.

On August 27, 2009, about two months after Pressley submitted her SSI claim, Jerrold Heinrich, Ph.D., a state agency psychologist, reviewed her record to assess her mental Residual Functioning Capacity ("RFC"). Doc. 14-8 at 442-459. Dr. Heinrich determined that Pressley had a mild restriction of daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id*. at 452. He also found Pressley to be moderately limited in her ability "to carry out detailed instructions," "to maintain attention and concentration for extended periods," "to respond appropriately to changes in the work setting," and "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." *Id*. at 456-457. He noted that Pressley could "understand, remember, and execute simple instructions consistently," but that she would "adapt more easily to a low-stress job where speed of performance was not essential for the work tasks."

*Id*. at 458. And he concluded that Pressley "retains the mental capacity and sufficient emotional stability to do at least simple tasks within the limitations noted." *Ibid*.

Also in August 2009, Francis Vincent, M.D., performed a physical RFC assessment of Pressley. *Id*. at 460-468. Dr. Vincent determined that Pressley could push and pull with her hands and feet normally, occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. *Id*. at 461. He noted that Pressley "sits around most of the day," that she "does clean, cook and shop," and that her claims of being "only able to lift 5 lbs and walk 1 block at a time" were "excessive when compared to the medical evidence and considered partially credible." *Id*. at 462. On January 19 and 22, 2010, Michael J. Schneider, Ph.D., and David Mack, M.D., reviewed Pressley's record and affirmed Dr. Heinrich's and Dr. Vincent's RFC determinations. *Id*. at 472.

On February 25, 2011, after Pressley's request for an ALJ hearing of the denial of her request for benefits had been granted, Norbert De Biase, M.D., conducted a thirty-minute consultative examination for the Bureau. *Id*. at 520. Dr. De Biase concluded that Pressley could make frequent use of her hands and feet for several activities, *id*. at 526, and could occasionally engage in a few postural activities, such as balancing, kneeling, stooping, crouching, and crawling, *id*. at 527, but could only occasionally lift and carry at least ten pounds, *id*. at 524. He also determined that Pressley could not sit or stand for longer than sixty minutes at a time or walk for more than thirty minutes at a time. *Id*. at 525. He further noted that, in an eight-hour workday, Pressley could not sit longer than sixty minutes total, stand longer than sixty minutes total, or walk longer than thirty minutes total. *Ibid*.

On February 25, 2011, Robert Prescott, Ph.D., performed a formal mental status evaluation of Pressley for the Bureau. *Id*. at 536-549. Dr. Prescott noted that Pressley had "denied any auditory or visual hallucinations," but that she was "tearful" and "did seem to be depressed." *Id*. at 540-541. He diagnosed Pressley with chronic PTSD, moderate depression, and cognitive disorder, and found her to be an "[in]adequate manager [of] funds." *Id*. at 543. During a follow-up assessment on March 25, 2011, Pressley scored a 29 on the Beck Depression Inventory, which is "within the severe range of depression." *Id*. at 544. On the Luria-Nebraska Neuropsychological Battery, Dr. Prescott noted that "[n]early all [her] scales, except memory, were above the critical level," and "[t]he general rule of thumb is, if three or more scales are elevated above critical level, it is indicative of brain damage." *Ibid*. In assessing her mental capacity for work, Dr. Prescott determined that Pressley suffered from a mix of mild and moderate impairments. *Id*. at 547-548.

From August 2011 through August 2013, Pressley was seen and treated eight times at the Vanguard Medical Group in Riverside, Illinois. *Id*. at 617-60. During this period, her body-mass index ("BMI") ranged from 47.5 to 51.3, indicating morbid obesity. *Id*. at 617, 628. At one appointment, treating physician Syed Rizvi, M.D., determined that Pressley showed 18/18 fibromyalgia tender points. *Id*. at 620. Dr. Rizvi diagnosed Pressley with myalgia and myositis, musculoskeletal leg cramps, lumbosacral spondylosis, restless leg syndrome, hypertension, and anxiety, and continued a prescription regimen of Flexeril, Amitriptyline, Venlafaxine, Hydrocodone, Amlodipine, and Alprazolam. *Ibid*.

On April 17, 2015, Pressley underwent an arthroscopy for a right shoulder derangement. Doc. 14-15 at 70-73. On May 4, 2015, an occupational therapist noted that Pressley's recovery was gradual, with "high emotional stress and changes." *Id*. at 78.

From January 2016 through August 2017, Pressley's medical record contains summaries from thirty unique visits.  *Id*. at 93-271.  Three points bear mention.

First, on July 22, 2016, Pressley underwent a left knee arthroscopy with a partial medial meniscectomy.  *Id*. at 121.  One impetus for this procedure was Pressley's report of severe pain. *Id*. at 116.  At that time, Pressley was on fifteen unique prescriptions, including oxycodone.  *Id*. at 118-119.  Although the surgeon noted that Pressley "tolerated the procedure well, [and] was taken to recovery in stable condition," *id*. at 121, she presented to the emergency room the next day complaining of knee pain, *id*. at 122.  From July 22 to August 29, 2016, Pressley underwent physical therapy, seeing a physical therapist ("PT") four times, *id*. at 122, 126, 129, 135, and a physical therapist assistant ("PTA") once, *id*. at 130.  In her last report, the PT noted that Pressley displayed "decreased [range of motion], decreased activity tolerance," "increased pain," and "gradual" progress towards her recovery goals, ultimately grading her "rehabilitation potential" as "poor."  *Id*. at 136.

Second, Pressley was seen by Collette Klein—an Advanced Practice Nurse and, as of January 2017, a Certified Nurse Practitioner—twelve times between January 2016 and August 2017.  *Id*. at 93, 98, 106, 110, 136, 146, 151, 160, 170, 177, 185, 266.  Klein diagnosed Pressley with PTSD, borderline personality disorder, and bipolar disorder.  *Id*. at 98, 106, 110, 136, 146, 151, 161, 170, 177, 185, 266.  Klein repeatedly noted that Pressley demonstrated crying, restless, or fidgety behavior, *id*. at 97, 101, 109, 114, 140, 150, 174, 271; had a tangential thought process, *id*. at 101, 109, 113, 140, 150, 155, 165, 174, 181, 189; appeared depressed, anxious, or irritable, *id*. at 97, 109, 114, 140, 150, 165, 189, 271; evinced a labile mood, *id*. at 101, 109, 114, 140, 150, 165, 174, 189, 271; and presented with impaired attention and concentration, *id*. at 165, 174, 181, 189, 271.  Klein posited that Pressley might suffer from auditory hallucinations of

her father's voice. *Id*. at 150, 155, 165, 174, 181, 189, 271. Pressley's GAF over the course of these visits ranged from 51 to 58. *Id*. at 106, 110, 137, 147, 178, 267.

Third, Angela Nimke, a Licensed Clinical Social Worker, saw Pressley five times from September 2016 through May 2017. *Id*. at 141, 144, 167, 174, 182. Nimke diagnosed Pressley with bipolar disorder, PTSD, and borderline personality disorder. *Id*. at 142, 145, 168, 176, 183. Pressley's mental status exam yielded nearly identical results on each visit, indicating that she suffered from a tangential thought process, delusions and hallucinations, limited judgment and insight, anger, anxiousness, depression, and lability, and that she was easily distracted with poor focus. *Id*. at 142, 144-45, 168, 175-76, 183. On the three occasions where Nimke assessed Pressley's GAF, she scored from 41 to 50. *Id*. at 143, 145, 169.

### B.     The Administrative Hearing

On September 26, 2017, after the district court's remand in *Pressley I*, a new ALJ held a hearing at which Pressley and Aimee Mowery, a vocational expert, testified. Doc. 14-10 at 37-82. Pressley testified as follows. She graduated high school with honors but had no additional higher education or vocational training. *Id*. at 43. Her last job was in 2002 or 2003 at Triple A Tobacco in Holland, Michigan, where she stocked shelves with cigarettes. *Id*. at 43-44. Before that, she worked several fast food jobs. *Id*. at 44-45. She stopped working due to spinal problems, mental problems, PTSD, and brain damage induced by child abuse. *Id*. at 45.

Elaborating on her spinal issues, Pressley testified she was unable to stand up straight for more than ten or fifteen minutes. *Ibid*. She experienced tingling down her spine, from her sciatic nerve to her heels. *Ibid*. Sitting hurt her lower back, and sitting for long periods caused her back to feel numb and tingle, like something was stabbing her. *Ibid*. She could comfortably sit for only forty-five minutes at a time. *Ibid*. She declined doctor's recommendations to take

medical marijuana because she did not want to be on it.  *Id*. at 49.  On a scale of one to ten, her

pain was always at a ten, but she was not on any prescription pain medication at the time and

instead took ibuprofen occasionally along with "back and body from the Dollar Store."  *Id*. at 50.

Those remedies took her pain down to an eight or nine level.  *Ibid*.  She previously weighed 485

pounds, but was down to 261 after taking Depakote.  *Id*. at 54.

Elaborating on her hand issues, Pressley testified that she could not make a fist or grasp

things with her right hand because certain tendons had been removed.  *Id*. at 48-49.  She slipped

and fell on her left arm and shoulder in July 2017 while taking out the garbage.  *Id*. at 49, 55-56.

She could do some things with her left hand, but ever since she hurt her arm it was hard for her

to use it.  *Id*. at 49.  She occasionally saw an orthopedic surgeon since falling.  *Ibid*.  She wore a

sling given to her by an emergency room doctor.  *Id*. at 56.  She had right shoulder surgery in

August 2015, and plates, pins, and screws were used to repair a rotator cuff.  *Id*. at 57.  It took

her eight months to recover from the surgery.  *Ibid*.

Elaborating on her knee issues, Pressley testified that she had left knee surgery in 2016 to

fix her meniscus and kneecap.  *Id*. at 58.  She wore a brace on her leg for seven months after the

surgery.  *Ibid*.  When she walked, her knee clicked, causing pain.  *Id*. at 59.  She fell twice due to

her knee problems, most recently a month before the hearing while she was walking up the stairs

in her home.  *Ibid*.  She could walk only fifteen to twenty feet before having to stop.  *Id*. at 60.

Norco stopped working to alleviate her pain.  *Ibid*.  Her insurance did not cover the cost of

medical marijuana.  *Id*. at 61.

Elaborating on her history of seizures, Pressley testified that she had seizures of ten

minutes duration.  *Id*. at 55.  The last time she had a seizure was a month before the hearing, and

that seizure lasted seven minutes. *Ibid*. During seizures, her hands would itch, her body would twitch, she felt loopy in the head, and then she would start falling. *Ibid*.

Elaborating on her hallucinations, Pressley testified that she had them since childhood. *Id*. at 46. She would hear the voice of her abusive father and see his face during sleep. *Ibid*. The hallucinations were getting worse, though she then took Haloperidol, which helped. *Id*. at 46, 62. While on that medication, the voices were not as pronounced and loud, but she still heard her father's voice twenty out of every thirty days. *Id*. at 63. If she worked, Pressley would not know when to talk to a coworker if she was hearing voices. *Id*. at 46.

Elaborating on her other mental health issues, Pressley testified to having bad anxiety. *Ibid*. Her PTSD caused her to get stressed easily and go into a rage. *Id*. at 46-47. Commercials that mentioned father figures triggered her PTSD. *Id*. at 47. She could not think of the same thing for more than ten minutes. *Ibid*. Her thoughts were constantly sporadic, and she could not concentrate on one thing at a time. *Ibid*. She could not deal with many people at once and became confused when more than one superior told her what to do. *Id*. at 48. She could not tolerate crowds. *Ibid*. When she shopped at Wal-Mart, she avoided aisles with many people. *Ibid*. She tried to shop at night when the store was less busy, and she had her son get things from the shelf for her. *Id*. at 63-64. She would become enraged at grocery store lines. *Id*. at 64-65. Her medication and therapy helped. *Id*. at 51. She was trying to see a psychiatrist, but in the meantime her nurse practitioner prescribed her medications. *Id*. at 61-62.

Elaborating on her daily life, Pressley testified that she has never driven due to her medical issues. *Id*. at 43. Because she could not grasp things, her fiancé would help with her hair every day. *Id*. at 52. She could take items out of the freezer and tried to do the dishes, but there was not much else she did around the house. *Ibid*. She liked reading about history on the

internet and helping her son with his homework, *id*. at 53, but she could not type and used the

voice-to-text feature on her phone, *id*. at 65. She got along well with her children. *Id*. at 55. She

had one friend who came over for coffee, but otherwise did not socialize or get out of the house

much. *Id*. at 53. A crowd of more than three people was too much for her. *Ibid*. She had

trouble interacting with others, and often impulsively said things that she knew she should not,

such as swearing. *Id*. at 66-67.

Mowery, the vocational expert, testified next. Vocational expert testimony helps to

determine "whether [the claimant's] work skills can be used in other work and the specific

occupations in which they can be used." 20 C.F.R. § 404.1566(e). A vocational expert may

"respon[d] to a hypothetical question about whether a person with the physical and mental

limitations imposed by the claimant's medical impairment(s) can meet the demands of the

claimant's previous work, either as the claimant actually performed it or as generally performed

in the national economy." *Id*. § 404.1560(b)(2).

In questioning Mowery, the ALJ first asked whether this hypothetical individual could

perform Pressley's past work:

> Light work, frequent ramps and stairs, no ladders, ropes or scaffolds.
> Stooping, kneeling, crouching and crawling all at frequent. No work at
> unprotected heights. Only occasional exposure to moving mechanical parts.
> No commercial operation of a motor vehicle. Nothing more than a moderate
> noise environment. This individual consistent with moderate limitations in
> the B criteria would be limited to simple, routine and repetitive tasks *but not
> at a production rate pace*. Simple work related decisions. Occasional
> interaction with supervisors and co-workers, none with the public. And then
> the individual could tolerate no more than occasional work changes
> throughout the day. So no more than one-third of the day. And this
> individual could also not do any tandem tasks with co-workers.

*Id*. at 70-71 (emphasis added). Mowery answered no, due to the exertion level. *Ibid*. The ALJ

then asked if there was any other work in the national economy for such an individual. *Id*. at 71.

Mowery answered yes, identifying three jobs (marker, inspector, and checker) with a combined

total of 415,000 positions in the national economy. *Ibid*. The ALJ then asked if that hypothetical person, reduced to a sedentary exertional level, would be able to perform any of Pressley's past work or otherwise work in the national economy. *Id*. at 72. The ALJ answered that the person would not be able to perform Pressley's past work, but would be able to work in the national economy, identifying three jobs (weight tester, final assembler, and bench worker) with a combined total of 88,000 positions in the national economy. *Ibid*.

On cross examination, Pressley's attorney asked Mowery whether any jobs existed in the national economy for a person who "cannot maintain *any* pace that is outlined by the employer, but [who] could work at a pace that would allow" someone to meet an end-of-day quota. *Id*. at 75-76 (emphasis added). At that point, the ALJ interrupted, altering the hypothetical to exclude the reference to an end-of-day quota. *Id*. at 76. In response, Mowery clarified that excluding "any production" pace would necessarily exclude any end-of-day quota, which in turn would eliminate any prospect of employment. *Ibid*.

After the cross examination, the ALJ sought to clarify the difference between his production rate pace hypothetical, which resulted in available positions, and Pressley's counsel's (modified) production rate pace hypothetical, which resulted in no available positions. *Id*. at 78-79. Mowery said that he interpreted counsel's hypothetical as excluding both a production rate pace and an end-of-day quota, while he interpreted the ALJ's hypothetical to exclude only a production rate pace. *Id*. at 79.

### C. The Commissioner's Decision

A claimant is disabled for purposes of the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The

claimant has the burden of showing that her impairments prevent her from performing prior

employment and any other job generally available in the national economy.  *See* 42 U.S.C.

§ 423(d)(2)(A).

On January 12, 2018, the ALJ issued a decision finding that Pressley was not disabled

and therefore ineligible for SSI.  *Id.* at 5-26.  The ALJ followed the five-step sequential

evaluation process for determining whether an adult claimant is disabled.  *See* 20 C.F.R.

§§ 416.920(a)(4)(i)-(v).  The five steps are as follows:

> The first step considers whether the applicant is engaging in substantial
> gainful activity.  The second step evaluates whether an alleged physical or
> mental impairment is severe, medically determinable, and meets a durational
> requirement.  The third step compares the impairment to a list of impairments
> that are considered conclusively disabling.  If the impairment meets or equals
> one of the listed impairments, then the applicant is considered disabled; if the
> impairment does not meet or equal a listed impairment, then the evaluation
> continues.  The fourth step assesses an applicant's residual functional capacity
> (RFC) and ability to engage in past relevant work.  If an applicant can engage
> in past relevant work, he is not disabled.  The fifth step assesses the
> applicant's RFC, as well as his age, education, and work experience to
> determine whether the applicant can engage in other work.  If the applicant
> can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (internal quotation marks omitted).

RFC "is defined as 'the most [the claimant] can still do despite [her] limitations.'"  *Id.* at 569

n.2 (first alteration in original) (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)).  "A finding of

disability requires an affirmative answer at either step three or step five.  The claimant bears the

burden of proof at steps one through four, after which at step five the burden shifts to the

Commissioner."  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  At the

fifth step, the Commissioner "must present evidence establishing that the claimant possesses the

[RFC] to perform work that exists in a significant quantity in the national economy."

*Weatherbee*, 649 F.3d at 569 (footnote omitted).

The ALJ determined that Pressley was not engaging in "substantial gainful activity" (step one), Doc. 14-10 at 8; that her obesity, ADHD, bipolar disorder, PTSD, degenerative disc disease of the lumbar spine, and knee surgery were "severe impairments" (step two), *id*. at 8-10; and that those impairments were not listed or equal to a listing in 20 C.F.R. § 404, subpart P, app. 1 (step three), *id*. at 11-14. At step four, the ALJ determined that Pressley had the RFC to perform sedentary work, as defined in 20 C.F.R. § 416.967(a), reasoning that she could "frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds," "frequently stoop, kneel, crouch and crawl," "have no work at unprotected heights," "occasionally have exposure to moving mechanical parts," "never operate a commercial motor vehicle," "work in no more than a moderate noise environment," "perform simple, routine and repetitive tasks but not at a production rate pace," "make simple work related decisions," "have occasional interaction with supervisors and coworkers, but no tandem tasks with coworkers," have no "interact[ion] with the public," and "have no more than occasional work changes throughout the day." *Id*. at 14. In so finding, the ALJ concluded that Pressley's testimony about "the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence," which led the ALJ to consider Pressley's reported symptoms "only to the extent they [could] reasonably be accepted as consistent" with that medical and other evidence. *Id*. at 16. Based on this RFC, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [Pressley] [could] perform" (step 5), thus rendering her not disabled. *Id*. at 24; *see* 20 C.F.R. § 416.969.

**Discussion**

Section 405 of the Social Security Act authorizes judicial review of the Commissioner's final decision—which, as noted, is the ALJ's final decision following the remand in *Pressley I*. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and his factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits." *Briscoe*, 425 F.3d at 355. The court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or that "is based on legal error," *Collins v. Astrue*, 324 F. App'x 516, 519 (7th Cir. 2009).

In addition to satisfying these standards, the Commissioner's final decision must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see also Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)

(holding that the Commissioner must "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks and alteration marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation and alteration marks omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Pressley challenges the Commissioner's decision on several grounds, arguing, among other things, that: (1) the ALJ did not assess whether her deteriorating mental impairments resulted in a discrete period of disability from January 2016 through January 2018, Doc. 25 at 8-9; (2) the ALJ did not evaluate her mental RFC to adequately justify her ability to meet an end-of-day quota, *id*. at 10-13; and (3) the ALJ improperly evaluated her testimony concerning her symptoms, *id*. at 15-18.

### A.    Discrete Period of Disability

Pressley first argues that the ALJ erred in concluding that she was not disabled for the entire period for which she claimed disability—June 23, 2009 through January 12, 2018—because the ALJ did not take account of a discrete period of mental decline from January 2016 through January 2018. *Id*. at 8-9. In support, Pressley cites the regulatory definition of disability, which encompasses "the inability to do any substantial gainful activity … for a continuous period of not less than 12 months," 20 C.F.R. § 416.905, and *Walker v. Berryhill*, 900 F.3d 479, 484 (7th Cir. 2018), for the proposition that remand is warranted when an ALJ does

not "explore whether the claimant was disabled for any discrete 12-month interval," Doc. 25 at 8. Pressley argues that her mental condition suffered a "precipitous decline" from "January 2016 onwards," thus warranting "a more restrictive RFC during that period," and that the ALJ "did not explain why" this decline "did not justify greater RFC limitations." *Ibid.*

The Commissioner devotes a paragraph to this argument, contending that "the ALJ considered the entirety of the longitudinal record, including the mental health treatment notes from January 2016 onward," which the ALJ concluded "showed plaintiff to have no more limitations than were already accommodated by her RFC." Doc. 30 at 11. The Commissioner argues that even if it were possible, based on this evidence, to reach a conclusion different from the ALJ's, that is insufficient to justify remand. *Ibid.* (citing *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[E]ven if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported.") (internal quotation marks omitted)).

The Commissioner's response is unpersuasive. Even if Pressley pushes the holding of *Walker* too far in arguing that an ALJ must account individually for each twelve-month period of claimed disability, the ALJ here still had to support her factual findings with substantial evidence, *see Jones*, 623 F.3d at 1160, could not ignore highly pertinent evidence, *see Parker*, 597 F.3d at 921, and had to build a logical bridge from that evidence to her conclusion, *see Young*, 362 F.3d at 1002. The ALJ's explanation does not do those things as to Pressley's mental health decline from January 2016 onward. Specifically, in assessing Pressley's visits with Klein and Nimke from January 2016 through August 2017, the ALJ concluded from their mental status examinations that Pressley "was consistently noted to have fair judgment, insight,

memory and concentration." Doc. 14-10 at 21; *see also id*. at 24 ("When [Pressley] did re-start treatment, she still possessed fair judgment, insight, memory and concentration.").

This is not a fair conclusion to draw from the record. Klein prepared twelve mental status examinations. Doc. 14-15 at 93, 98, 106, 110, 136, 146, 151, 160, 170, 177, 185, 266. While Klein found Pressley to have "fair" judgment and insight in each, Klein's five most recent reports, from November 2016 to August 2017, concluded that her attention and concentration was "impaired." *Id*. at 165, 174, 181, 189, 271. And in all five reports she completed from September 2016 to May 2017, Nimke found Pressley to have "limited" judgment and "limited" insight and noted in the "Attention/Concentration" metric that she was "[e]asily distracted [with] poor focus." *Id*. at 142, 144-45, 168, 175-76, 183. Moreover, the ALJ inaccurately characterized the record regarding Pressley's hallucinations, citing generally to Klein's and Nimke's reports for the proposition that, "[d]espite [Pressley's] testimony, the record indicates she often denies hallucinations." Doc. 14-10 at 24. That finding does not account for the fact that Klein noted Pressley's potential hallucinations in at least seven reports, Doc. 14-15 at 150, 155, 165, 174, 181, 189, 271, and Nimke in every report, *id*. at 142, 144-45, 168, 175-76, 183.

Taken together, these shortcomings in assessing Klein and Nimke's evaluations require remand. *See Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (reversing the denial of benefits because the ALJ "failed to properly consider the relevant evidence," and "without any discussion of these relevant factors, the ALJ failed to build a logical bridge between the evidence and her conclusion"); *Parker*, 597 F.3d at 921 ("[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome.") (citation

omitted); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence … .").

###### B.    Mental RFC

Pressley also argues that the ALJ did not adequately explain why she could perform jobs requiring an end-of-day quota.  Doc. 25 at 10-13.  As Pressley observes, Mowery testified that "an individual who could not meet a production rate pace *nor* meet end-of-day-quotas would not be able to sustain work."  *Id*. at 11 (emphasis added); *see also* 14-10 at 78-79 (vocational expert's testimony).  Consequently, Pressley argues, even if "the [ALJ's] exclusion of a production rate pace [from her counsel's hypothetical] … permitted [Pressley] to perform [certain] jobs, the ALJ did not explain why she would be able to meet end-of-day quotas given her significant problems with concentration, persistence, or pace."  Doc. 25 at 11.

The Commissioner agrees that the vocational expert testified that a hypothetical claimant could not obtain any work if she could meet neither a production rate pace nor an end-of-day quota.  Doc. 30 at 9-10.  The Commissioner argues, however, that the ALJ's determination that Pressley had only "moderate" difficulties in her mental capacities necessarily implies that the ALJ found that she could meet end-of-day quotas.  *Id*. at 10.

The Commissioner reads far too much into the ALJ's opinion.  The ALJ determined that Pressley could not perform work requiring "a production rate pace," Doc. 14-10 at 14, but did not provide any rationale for why she could meet end-of-day quotas.  Indeed, nowhere does the ALJ even mention end-of-day quotas as a point of analysis, despite Mowery's testimony highlighting them as a key variable.  Doc. 14-10 at 78-79.  This is significant, as it is undisputed among Pressley, the Commissioner, and Mowery that an inability to meet end-of-day quotas would render Pressley unemployable.  Doc. 25 at 11; Doc. 30 at 9-10; Doc. 14-10 at 78-79.

Pressley's ability to meet an end-of-day quota cannot be implied from the ALJ's opinion or from the record. Klein's and Nimke's mental status reports indicate that Pressley repeatedly demonstrated crying, restless, or fidgety behavior; had a tangential thought process; appeared depressed, anxious, or irritable; evinced a labile mood; presented with impaired attention and concentration; and posited that she might suffer from auditory hallucinations of her father's voice. Doc. 14-15 at 93-272. Klein and Nimke diagnosed Pressley with PTSD, borderline personality disorder, and bipolar disorder. *Ibid*. While the court does not decide whether or not these diagnoses are consistent with a finding that she could satisfy an end-of-day quota, an ALJ opinion answering that question in the affirmative must at least address those diagnoses in relation to end-of-day quotas. The ALJ's silence on that issue means that the ALJ's opinion did not build the required "logical bridge," *Barnhart*, 362 F.3d at 1002, with "a narrative discussion [that] describe[es] how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," S.S.R. 96-8p, 1996 WL 374184, at *7. That shortcoming "is sufficient to warrant reversal of the ALJ's decision." *Briscoe*, 425 F.3d at 352 (noting a lack of logical narrative under SSR 96-8p).

### C. Pressley's Testimony Regarding Her Symptoms

Pressley also contends that the ALJ failed to give proper credence to her testimony concerning her symptoms. Doc. 25 at 15-18. As the ALJ will have the opportunity on remand to reconsider other aspects of Pressley's claim, it is unnecessary to consider this argument here. *See Fox v. Astrue*, 2010 WL 1381662, at *6 (S.D. Ind. Mar. 30, 2010) ("[B]ecause on remand the ALJ will reconsider the mental health evidence and restrictions … that process is likely to also [a]ffect the ALJ's view of [the claimant's] overall credibility. Under these circumstances, the court cannot affirm the ALJ's credibility analysis."); *Hudson v. Astrue*, 2009 WL 2612528, at

*14 n.6 (N.D. Ill. Aug. 24, 2009) ("In light of this remand order [to reassess an RFC determination], we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including … [her] credibility decisions in determining [the] plaintiff's RFC.").

That said, two brief words are warranted. First, Pressley argues that the ALJ's determination that her testimony was "not entirely consistent" and not "fully consistent" with the record as a whole applies an "overly stringent legal standard." Doc. 25 at 15 (internal quotation marks omitted) (citing *Parker*, 597 F.3d at 921-22). Without speaking to whether the ALJ's use of those phrases amounts to the "meaningless boilerplate" criticized in *Parker*, 597 F.3d at 922, any decision on remand should clearly lay out "what weight the trier of fact gave [Pressley's] testimony." *Ibid*. Second, the ALJ should address Pressley's argument that her ability to engage in sporadic activities, such as attending a baseball game, does not undercut the credibility of her mental health testimony. Doc. 25 at 15; *see Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("Suppose that half the time [claimant] is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.").

## Conclusion

Pressley's motion for judgment is granted, the Commissioner's motion for judgment is denied, and this case is remanded to the Commissioner for further proceedings consistent with this opinion. Given the grounds articulated for this disposition, it is unnecessary to address whether Pressley's other arguments support the same result.

January 24, 2020

_____
United States District Judge